623 F.2d 829
 Jane ROE, Mary Moe, and Annyce Hawkins, Individually and on
behalf of all others similarly situated; John Franklin,
M.D., and Louis Gerstley, III, M.D., Individually and on
behalf of all others similarly situated; Planned Parenthood
of Southeastern Pennsylvania, Elizabeth Blackwell Health
Center for Women, Women's Health Service, and Philadelphia
Welfare Rights Organization, Pennsylvania Not-for-Profit
Corporations, Appellees,
v.
Robert E. CASEY, Individually and in his official capacity
as Treasurer of the Commonwealth of Pennsylvania; and Helen
O'Bannon, Individually and in her official capacity as
Secretary of the Pennsylvania Department of Public Welfare,
Appellants.
Appeal of J. Edward LYNCH, M.D., Thomas F. Toomey, M.D., and
Charles F. Dougherty, Movants to Intervene as Defendants.
 Nos. 79-1108, 79-1246 and 79-1247.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 14, 1979.
Decided April 18, 1980.
As Amended May 21, 1980.
 
 Louis G. F. Retacco, Chief Counsel to the State Treasurer, Harrisburg, Pa., for appellant Casey.
 William B. Ball, Sp. Asst. Atty. Gen. (argued), Ball & Skelly, Harrisburg, Pa., Edward G. Biester, Jr., Atty. Gen., Pennsylvania Dept. of Justice, Harrisburg, Pa., for appellant O'Bannon.
 C. Clark Hodgson, Jr., Georganne Daher Terrill, Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for appellants Lynch, Toomey and Dougherty.
 Alice M. Price, Susan Cary Nicholas, Women's Law Project, Philadelphia, Pa., Sheri Friedman, Roland Morris, Philadelphia, Pa., Paulette Ettachild, Law Center South, Community Legal Services, Philadelphia, Pa., for appellees; Paul Bender, Thomas B. Harvey, Jr., ACLU, Philadelphia, Pa., of counsel, Nancy Schulz, on brief.
 Marsha Levick, Juvenile Law Center of Philadelphia, Philadelphia, Pa., for The Juvenile Law Center of Philadelphia, amicus curiae.
 Thomas M. Schubert, George S. Forde, Jr., Richard J. Kradjel, E. Arthur Thompson, Gerry J. Woods, Philadelphia, Pa., for Pennsylvania Pro Life Coalition of Pennsylvania for Human Life, Americans United for Life, amici curiae; John D. Gorby, Patrick A. Trueman, Dennis J. Horan, Legal Defense Fund, Chicago, Ill., of counsel.
 Theodore Simon, Philadelphia, Pa., for Pennsylvania NOW, National Emergency Civil Liberties Committee, Pennsylvania Council of the Union of American Hebrew Congregations and the Philadelphia Chapter of the National Lawyers Guild, amicus curiae.
 Doris J. Dabrowski, Philadelphia, Pa., for The Clara Bell Education Fund, amicus curiae; Martha Swartz, Taylor Zimmerman, on brief.
 Before HUNTER, WEIS and GARTH, Circuit Judges.OPINION OF THE COURT
 GARTH, Circuit Judge.
 
 
 1
 This appeal calls upon us once again to deal with the difficult and controversial subject of abortion.[1] We are asked to decide whether two Pennsylvania statutes[2] contravene the requirements of Title XIX of the Social Security Act[3] the federal Medicaid law inasmuch as the Pennsylvania enactments restrict state funding of "medically necessary" abortions. In addition, we must determine whether Congress, in enacting the so-called "Hyde Amendments" to several recent federal appropriations bills,[4] effected substantive changes in the Medicaid law.
 
 
 2
 We conclude that the Hyde Amendment modifies Title XIX and thereby reduces the states', and hence Pennsylvania's, substantive obligations, but we find the Pennsylvania statutes to be at variance with even this lesser standard. As a reviewing court, we deem it inappropriate to redraft the Pennsylvania statutes so as to make them comply with federal law. Accordingly, having reached the same conclusion as the district court, albeit by a somewhat different approach, we affirm the district court's order which enjoined the operation of Pennsylvania Public Laws 16A and 148 in their entireties.[5]
 
 I.
 
 3
 In 1978 the Pennsylvania legislature enacted appropriation and substantive legislation which, in substantially identical terms, prohibited the Commonwealth from "pay(ing) for, mak(ing) reimbursement for, or otherwise . . . support(ing) the performance of any abortion except where the abortion is certified in writing by a physician to be necessary to save the life of the mother."[6] (emphasis added). Plaintiffs, who include pregnant women eligible for Medicaid who are in need of therapeutic abortions, doctors who perform abortions, and health care agencies which provide abortion services, filed this class action under 42 U.S.C. § 1983 challenging the Pennsylvania laws on both statutory and constitutional grounds. They sought to enjoin the defendants, the Treasurer of the Commonwealth and the Secretary of the Department of Public Welfare, from refusing to fund medically necessary abortions for women whose pregnancies were not life endangering. In addition, they sought a declaration that the statutes were invalid.
 
 
 4
 The district court granted class certification and held that the plaintiffs had standing to bring the claims which they asserted.[7] With respect to the merits of the plaintiffs' complaint, the district court held that Title XIX:
 
 
 5
 requires participating states to provide all medically necessary services, including medically necessary abortions, to eligible participants of the program, and that Public Acts 16A and 148, by limiting Medicaid reimbursement to those abortions necessary to save the life of the mother, arbitrarily discriminate against medically necessary abortions on the basis of the diagnosis, type of illness or condition involved, in violation of the objective and requirements of Title XIX and its implementing regulations.
 
 
 6
 Roe v. Casey, 464 F.Supp. 487, 499-500 (E.D.Pa.1978). The district court did not reach the question of whether the Hyde Amendment modified or amended Title XIX. Rather, it held that because the Pennsylvania statutes were even more restrictive than the Hyde Amendment, they would be invalid even under a modified Title XIX. Therefore, based upon its interpretation of Title XIX, without reference to the Hyde Amendment, the district court entered an order enjoining the operation of the Pennsylvania statutes. Because it disposed of the case entirely on statutory grounds, the district court properly did not address the plaintiffs' constitutional claims.
 
 II.
 
 7
 The district court read Title XIX to require that Pennsylvania must fund all abortions which are "medically necessary." The court relied upon the language of the statute which provides appropriations to enable each state "as far as practicable to furnish . . . medical assistance on behalf of individuals, whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396. The district court took note of the fact that standard abortion procedures "involve most, if not all" of the types or classes of services which are to be furnished to the categorically needy.[8]
 
 
 8
 The Courts of Appeals for the First and Seventh Circuits, when confronted with similar abortion funding issues, read Title XIX more narrowly than did the district court here. Preterm, Inc. v. Dukakis, 591 F.2d 121, 124-26 (1st Cir.), cert. denied, 441 U.S. 952, 99 S.Ct. 2182, 60 L.Ed.2d 1057 (1979); Zbaraz v. Quern, 596 F.2d 196, 198-99 (7th Cir. 1979).[9] Both of those courts observed that the clause contained in the statute "necessary medical services" is limited to describing the beneficiaries of Title XIX i. e. individuals "whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396. Neither the First nor the Seventh Circuit was willing to interpret this language, which imports identification, as language imposing a substantive requirement on the states.
 
 
 9
 If we were obliged to resolve this difference in interpretation, we would favor the narrower approach taken by the First and Seventh Circuits. But unlike those courts we do not find it essential to resolve this question of statutory meaning in order to decide this case. If indeed the Hyde Amendment constitutes a substantive change to Title XIX, we should focus on the "amended" Title XIX. Any other analysis of the original and unamended Title XIX, as it pertains to abortion, would then become unnecessary.
 
 
 10
 Thus, before addressing the scope of Title XIX generally, we turn to a consideration of the Hyde Amendment and whether that enactment has substantively amended Title XIX so as to specify and limit the abortions which may be funded under Medicaid.
 
 III.
 
 11
 In each of the past four years, Congress has passed the so-called "Hyde Amendment" as a rider to the federal appropriations legislation.[10] The version of the 1979 Hyde Amendment currently in effect for fiscal year 1980 provides as follows:[11]
 
 
 12
 Sec. 109. Notwithstanding any other provision of this joint resolution except section 102, none of the funds provided by this joint resolution shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest, when such rape or incest has been reported promptly to a law enforcement agency or public health service;
 
 
 13
 Nor are payments prohibited for drugs or devices to prevent implantation of the fertilized ovum, or for medical procedures necessary for the termination of an ectopic pregnancy.
 
 
 14
 Our task is to determine whether the Hyde Amendment should be construed as an amendment to Title XIX. In that event, the Amendment would implicitly repeal a portion of that Title, thereby reducing the states' obligations to fund abortions to only those specified by the Amendment.
 
 
 15
 The Appellees, in seeking our affirmance of the district court, and Judge Hunter in his concurring opinion, argue that the Hyde Amendment has no substantive effect on Title XIX. They assert that the plain language of the Hyde Amendment "none of the funds provided by this joint resolution shall be used to perform abortions except . . ." limits the impact of the provision solely to the use of federal funds. Thus, the Amendment, according to Appellees, would have no impact on the states' obligations, to provide abortion services under Medicaid. They contend that we should not look behind this plain language in order to find any change with respect to the states' obligations to make expenditures under the Medicaid Act. In addition, they argue that established canons of statutory construction counsel against finding that a substantive statute has been repealed by an appropriations act. Similar arguments were rejected by the First Circuit in Preterm, Inc. v. Dukakis, supra, by the Seventh Circuit in Zbaraz v. Quern, supra, and by the Eighth Circuit in Hodgson v. Board of County Commissioners, supra.[12] We agree with the First, Seventh and Eighth Circuits that the Hyde Amendment does indeed modify Title XIX, and is not to be construed as a mere withholding of federal funds.
 
 
 16
 The construction urged by Appellees leads to a result which is not consonant with the policies of the Medicaid Act. Title XIX is based upon a scheme of "cooperative federalism." The Medicaid statute envisions that the costs of medical services will be shared between the states and the federal government. See 42 U.S.C. § 1396b. If the Appellees are correct, and the Hyde Amendment only withholds federal funds and does not otherwise affect Title XIX, then the entire cost of funding Medicaid abortions would have to be borne by the states. Appellees do not point to, and we cannot find, any other Medicaid service which is, by design, entirely state funded.[13] Therefore, because the literal language of the Hyde Amendment, which is limited to expenditures of federal funds, seems at odds with the entire structure of the Medicaid statute, we must look behind the language of the Act to determine if this unique result was, in fact, intended by Congress.
 
 
 17
 In this case, the clearest evidence of legislative intent is found in the Congressional floor debates.[14] The Congressional debates on the previous versions of the Hyde Amendment are analyzed extensively in the opinions of the First, Seventh and Eighth Circuits. Our own reading of these proceedings leads us to no different conclusion than that reached by the Preterm, Zbaraz and Hodgson courts. The debates on the current version of the Hyde Amendment occurred sporadically from June to November, 1979. Our independent analysis of these most recent debates indicates that they reveal the same Congressional concerns and the same Congressional intention as the earlier ones. We therefore conclude that in enacting the present (fiscal year 1980) Hyde Amendment, Congress intended, as it had in the earlier Hyde Amendments, to alter the scope of Title XIX to restrict the funding of abortions.
 
 
 18
 At oral argument the Appellees claimed that in these highly emotional discussions, the members of Congress treated abortion as a moral issue. They claimed that the legislators, on moral grounds, simply sought elimination of federal participation in abortions. This moral position could not be achieved however, by the construction of the Hyde Amendment which the Appellees advance. For under their construction, the states would then be required to fund 100% of the costs of abortions rather than only a portion of such costs. Thus, the states would be under an increased obligation to fund abortions, an obligation which would result entirely from a federal statute Title XIX. Therefore the federal influence on abortions would not be curtailed. Abortions which would no longer be federally funded, would still be federally required.
 
 
 19
 Furthermore, we find it difficult to presume that the Hyde Amendment was simply an appropriations bill in light of the fact that the subject of finances was not debated. Extensive, detailed discussions of the costs associated with the measure the type of discussions which usually attend appropriations measures do not appear in the legislative history. Instead, the legislative history is permeated with ethical, sociological and political debates on the subject of abortion. In regard to this, it is instructive to observe that the Hyde Amendment was originally but one section of a broader bill providing appropriations for HEW and the Department of Labor. As we read the debates on the entire bill, see, e. g., 125 Cong.Rec. H 5213-76 (June 27, 1979 daily ed.), we cannot help but note the drastic change in the nature of the discussion when the subject of abortion was introduced, see id. at H 5213-18 and H 5253-62. The discussion changed from "how much" funds were to be appropriated for various projects to "which" abortions will be funded. Accordingly, several amendments were offered or discussed in the course of the debate which would have affected the scope of the Hyde Amendment insofar as the categories of abortions to be funded. Some amendments would have included categories found in the broader fiscal 1979 Hyde Amendment. Id. at H 5256 (Rep. O'Bey). Others would have included funding for abortions where it could be determined that the baby would have sickle cell anemia, id. at H 5253 (Rep. Stokes), or Tay Sachs disease, id. at H 5213 (Rep. Edwards). These types of substantive policy decisions hardly comport with the model for appropriations legislation.
 
 
 20
 Finally, numerous members of Congress expressed displeasure that the issue of abortion had to be raised in the context of appropriations legislation. Those legislators were particularly disturbed because the abortion issue threatened to prevent approval of the federal budget.[15] See, e. g. 125 Cong.Rec. S 16713 (Nov. 15, 1979 daily ed.) (Sen. Exon); id. at H 10957 (Nov. 16, 1979 daily ed.) (Rep. Bauman). Nonetheless, as several of its proponents made clear, the Hyde Amendment was dealt with in the context of an appropriations bill because that was the only legislative vehicle which could be utilized. See id. at H 5216 (June 27, 1979 daily ed.) (Rep. Hyde). The House, in fact, suspended its normal rules against substantive lawmaking in appropriations measures during its consideration of the Hyde Amendment. Id. at H 5218 (June 27, 1979 daily ed.). These facts make clear that the Hyde Amendment was not a normal "garden variety" appropriations measure.
 
 
 21
 We are not unmindful of Appellees' and Judge Hunter's arguments based upon the principles of statutory construction. Indeed, cognizant of the difficulties which may arise, we are most reluctant to find that an appropriations measure has implicitly repealed substantive law. See TVA v. Hill, 437 U.S. 153, 189-91, 98 S.Ct. 2279, 2299-2300, 57 L.Ed.2d 117 (1978). But it is not our duty to prescribe optimal methods of legislation. Rather it is simply our duty to interpret statutes in accordance with the intent of the legislature. In this case, we find the intent of the legislature to be clear. Notwithstanding rules of statutory interpretation which may counsel otherwise, the legislative history makes it evident that the Congress intended the Hyde Amendment to have substantive impact. Therefore, we hold that states are not required under Title XIX to provide abortions which the federal government, under the Hyde Amendment, will not fund.
 
 
 22
 Our holding that the Hyde Amendment constitutes a substantive modification of Title XIX, restricting the funding of abortions, still does not operate to validate Pennsylvania's statutes. For Title XIX, as now modified, requires the states to fund abortions in two categories: where the mother is endangered and where the pregnancy was the result of rape or incest. Pennsylvania, under Public Laws 16A and 148, would not fund the second category. Because Pennsylvania's statutes are not consistent with the modified Title XIX it is clear that, as written, they cannot stand.
 
 IV.
 
 23
 To conform with the Hyde Amendment, the Pennsylvania statutes would have to provide funding for rape and incest cases in addition to those situations where abortions are necessary because of danger to the mother's life. This would require the addition of specific language to the statutes themselves. Pennsylvania does permit courts to add wording to a statute to aid in its construction but only when the addition does not "in any way affect (the) scope and operation" of the statute. 1 Pa.Con.Stat.Ann. (Purdons) 1923(c) (Supp.1978). If we were to add provisions to the Pennsylvania statutes to require payment for abortions in cases of rape and incest, the "scope and operation" of the enactments would unquestionably be enlarged. In that event, we would have exceeded our judicial role and we would be engaging in positive legislative enactment, a proper function of the Pennsylvania Assembly, which it has reserved to itself.[16]
 
 
 24
 Long established principles of federal law also dictate against courts inserting limitations in order to rescue otherwise invalid statutes. United States v. Reese, 92 U.S. 214, 221, 23 L.Ed. 563 (1879). Recently, Judge Aldrich, writing for a three judge court in Massachusetts, echoed this time-honored concern. Baird v. Bellotti, 450 F.Supp. 997 (D.Mass.1978), affirmed 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979). Faced with a Massachusetts state court decision which construed a state statute against the plain meaning of its terms so as to make it constitutional, Judge Aldrich wrote:
 
 
 25
 Here something more is involved than construing language. The Massachusetts court, in addition to contradicting its specific terms, suggests reading into the statute affirmative provisions made out of nothing but a generally announced purpose to pass constitutional muster. 10 In so doing, the court seems to have found the ultimate remedy for all constitutional infirmities. If a statute which, in terms, requires parental consultation without exception, can be "construed to require as much parental consultation as is permissible constitutionally," here, at once, is an instant cure, both for overbreadth, and for lack of standards. Regardless of whether a statute says too much, or too little, so long as the legislature intended it to be constitutional, when it comes before a court it will be appropriately rewritten. With due respect, we cannot believe this to be possible. Cf. United States v. Reese, 1875, 92 U.S. 214, 221, 23 L.Ed. 563.
 
 
 26
 Id. at 1005-1006 (footnote omitted).
 
 
 27
 There is nothing in the record to indicate what course Pennsylvania would choose to follow given the amendment to Title XIX by the Hyde enactment and we are not free to substitute our speculation for the judgment of the duly constituted officials of the state. This court should refrain from acting on a "matter which properly requires the exercise of policy judgment by the legislature." 2A C. D. Sands, Sutherland Statutory Construction § 47.36 (4th ed. 1973).
 
 
 28
 The injunction issued by the district court enjoined the enforcement of the statutes. Although our reasoning differs from that of the district court in that we hold the Hyde Amendment alters Title XIX, nevertheless, we must affirm the grant of the injunction. We do so, because only by improperly adding to the express language of the Pennsylvania statute could we modify the injunction. Accordingly the order of December 21, 1978 will be affirmed.
 
 
 29
 JAMES HUNTER, III, Circuit Judge, concurring.
 
 
 30
 Although I agree with the majority that the district court's injunction prohibiting enforcement of Pennsylvania's highly restrictive abortion funding statutes was proper. I cannot agree that the 1979 Hyde Amendment, a rider to the 1979 HEW appropriations bill, substantively alters the obligations of the states under Title XIX of the Social Security Act. Nor, for that matter, do I believe that the 1979 Hyde Amendment is properly before this court.
 
 I.
 
 31
 Title XIX of the Social Security Act of 1965, 42 U.S.C. §§ 1396-1396k (1976 & Supp. II 1978), establishes the Medicaid program, a system of cooperative federalism under which states which choose to participate provide, with help from the federal government, medical assistance to individuals "whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396 (1976).
 
 
 32
 Although no state is required to participate in the program, those which decide to do so must comply with the applicable federal statutory and regulatory standards. Under those standards, participating states may elect to provide medical services to only the "categorically needy" or to both the "categorically needy" and the "medically needy."[1] 42 U.S.C. § 1396a(a)(10)(A) & (C) (1976). All participating states are required to provide the "categorically needy" with at least five broad categories of medical services. 42 U.S.C. § 1396a(a)(13)(B) (1976). In addition, states which decide to provide medical services to the "medically needy" are required to provide either at least the five broad categories of medical services which are provided to the "categorically needy" or at least seven of sixteen broad categories of medical services. 42 U.S.C. § 1396a(a)(13)(C) (1976). Pennsylvania has chosen to extend coverage to both the "categorically needy" and the "medically needy" and to provide the "medically needy" with those medical services which the "categorically needy" are required to receive. 62 P.S. §§ 441.1, 443.1-443.3 (Supp.1979). Included in the five broad categories of medical services which Pennsylvania provides to both the "categorically needy" and the "medically needy" are: (1) inpatient hospital services, (2) outpatient hospital services, (3) other laboratory and X-ray services, (4) skilled nursing facility services for individuals twenty-one or older, screening, diagnosis, and treatment of individuals under the age of twenty-one, and family planning services and supplies for individuals of child bearing age, and (5) physicians' services. 42 U.S.C. § 1396d(a)(1)-(5) (1976).
 
 
 33
 Although, as the Supreme Court has stated, "Title XIX does not require States to provide funding for all medical treatment falling within the five general categories, it does require that state Medicaid plans establish 'reasonable standards . . . for determining . . . the extent of medical assistance under the plan which . . . are consistent with the objectives of (Title XIX).' " Beal v. Doe, 432 U.S. 438, 441, 97 S.Ct. 2366, 2369, 53 L.Ed.2d 464, 470 (1977), quoting 42 U.S.C. § 1396a(a)(17) (1976). The question of how Title XIX's requirement of "reasonable standards . . . consistent with the objectives of (the Act)" restricts the discretion that the states would otherwise enjoy in determining the extent of medical services to provide is not an easy one. As the Supreme Court has remarked, "serious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage." Beal v. Doe, supra, 432 U.S. at 444, 97 S.Ct. at 2371, 53 L.Ed.2d at 472. The district court in this case resolved those "serious statutory questions" by holding that "Title XIX requires participating states to provide all medically necessary services, including medically necessary abortions, to eligible participants of the program." Roe v. Casey, 464 F.Supp. 487, 499 (E.D.Pa.1978).
 
 
 34
 In concluding that Title XIX requires participating states to provide all medically necessary services, the district court focused on the stated objective of Title XIX: to provide medical assistance to those unable to afford necessary medical services. There is much to commend the district court's determination that medical necessity is the proper standard for reconciling the tension between state discretion and the underlying requirements of Title XIX. Although the Act nowhere explicitly states that all medically necessary services must be provided, the clear and unmistakable purpose of the Act is to provide necessary medical services to those in greatest need of such services. See White v. Beal, 555 F.2d 1146 (3d Cir. 1977). A requirement that participating states provide all medically necessary services within the five broad categories of services such states are required to provide would appear to adequately and intelligently effectuate the underlying purposes of the Act. There are, however, problems with such an approach. For one thing, the phrase "necessary medical services" is used to identify those whom the Medicaid program is designed to provide with medical assistance, rather than to specify the extent of the medical assistance which must be provided. In addition, the initial section of the Act which states that the objective of the Act is to provide medical assistance to those unable to afford necessary medical services, also recognizes that a participating state may carry out the objectives of the Act "as far as practicable under the conditions in such State." 42 U.S.C. § 1396 (1976). Whether this may be accomplished only by limiting the medical services provided to all medically necessary services within the five broad categories which participating states are required to provide or whether participating states may further delimit the services they provide on the basis of factors such as cost is far from clear. This, however, is not a question we need decide today since the question of whether Pennsylvania is required to provide funding for medically necessary abortions is answered, and answered clearly, by other statutory and regulatory provisions of Title XIX.
 
 
 35
 Under regulations promulgated by the Department of Health, Education, and Welfare pursuant to Title XIX which have the full force and effect of law, Chrysler Corporation v. Brown, 441 U.S. 281, 295-96, 99 S.Ct. 1705, 1714, 60 L.Ed.2d 208 (1979), a participating state "may not arbitrarily deny or reduce the amount, duration, or scope of a required service . . . to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230 (1979). In White v. Beal, supra, this court construed a predecessor version of the regulation containing the identical operative language as the current version as allowing "discrimination in benefits based upon the degree of medical necessity but not upon the medical disorder from which the person suffers." White v. Beal, supra, 555 F.2d at 1152 (footnote omitted).
 
 
 36
 Pennsylvania has singled out pregnancy, in particular pregnancies which present medical complications short of endangering the life of the mother, as a condition for which the state will not provide all medically necessary services. In doing so, Pennsylvania has, I believe, improperly contravened the prohibition against reducing or denying medical treatment solely on the basis of condition. As the Court of Appeals for the First Circuit stated in addressing a similar, though less restrictive, state statute: "When a state singles out one particular medical condition here, a medically complicated pregnancy and restricts treatment for that condition to life and death situations it has, we believe, crossed the line between permissible discrimination based on degree of need and entered into forbidden discrimination based on medical condition." Preterm, Inc. v. Dukakis, 591 F.2d 121, 126 (1st Cir.), cert. denied, 441 U.S. 952, 99 S.Ct. 2181, 60 L.Ed.2d 1057 (1979).
 
 
 37
 In addition, Pennsylvania runs afoul of this court's pronouncement in White v. Beal, supra, that although state discretion in administering Title XIX is broad, participating states must provide medical services "in a manner which bears a rational relationship to the underlying federal purpose of providing the service to those in greatest need of it." White v. Beal, supra, 555 F.2d at 1151. By providing a full range of medically necessary services to women who anticipate a normal delivery at full term, but only a limited range of medically necessary services to women with medically complicated pregnancies who risk severe and permanent injury but not death, Pennsylvania has failed to provide medical services to those in greatest need of such services as is required by Title XIX. Moreover, such an approach clearly violates the statutory requirement that participating states provide medical services "in a manner consistent with . . . the best interests of the recipients." 42 U.S.C. § 1396a(a)(19) (1976). By failing to provide medically necessary abortions to women who risk serious and irreversible injury, Pennsylvania has turned its back on the best interest of those eligible to receive medical services under Title XIX.
 
 
 38
 Accordingly, unless the 1979 Hyde Amendment substantively alters the obligation which Pennsylvania would otherwise have to provide medically necessary abortions. Pennsylvania's restrictive abortion statutes must fall.
 
 II.
 
 39
 During each of the past four years, Congress has enacted amendments, known as Hyde Amendments, as riders to federal appropriations legislation. Although each of the four Hyde Amendments which Congress has enacted limits the expenditure of federal funds for abortions, the language and legislative history of the various Hyde Amendments varies greatly.
 
 
 40
 The final decision of the district court from which this appeal is taken addresses the impact of the 1977 Hyde Amendment, Pub.L. No. 95-205, § 101, 91 Stat. 1460 (1977), on the substantive obligations of participating states under Title XIX. The 1977 Hyde Amendment provided:
 
 
 41
 That none of the funds provided for in this paragraph (authorizing appropriations for the Departments of Labor and Health, Education, and Welfare for fiscal year 1978) shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest, when such rape or incest has been reported promptly to a law enforcement agency or public health service; or except in those instances where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term when so determined by two physicians.
 
 
 42
 The majority opinion, however, addresses only the 1979 Hyde Amendment, Pub.L. No. 96-123, § 109, 93 Stat. 923 (1979), which was enacted six days after oral argument in this case. The 1979 Hyde Amendment provides that:
 
 
 43
 (N)one of the funds provided by this joint resolution (authorizing appropriations for fiscal year 1980) shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest when such rape or incest has been reported promptly to a law enforcement agency of public health service.
 
 
 44
 Unlike the 1977 Hyde Amendment, the 1979 Hyde Amendment prohibits the expenditure of federal funds for abortions where "severe and long lasting physical health damage to the mother would result if the pregnancy were carried to term." Addressing the 1977 Hyde Amendment, the district court concluded that it did not substantively alter the obligations of participating states under Title XIX, but that it was merely "a congressional affirmance of the Supreme Court's decision in Beal v. Doe . . . that states need not provide funding for nontherapeutic services, including nontherapeutic abortions." Roe v. Casey, supra, 464 F.Supp. at 502. If faced with the 1979 Hyde Amendment, the district court might well, I suspect, come to a different conclusion.[2]
 
 
 45
 In Singleton v. Wulff, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), an abortion case, the Supreme Court reversed the judgment of the Court of Appeals and remanded the case to the district court because the Court of Appeals decided the case on the basis of issues which had never been presented to the district court. In Singleton, the Court stated:
 
 
 46
 It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below. In Hormel v. Helvering, 312 U.S. 552, 556, 61 S.Ct. 719, 721, 85 L.Ed. 1037, 1040 (1941), the Court explained that this is "essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues . . . (and) in order that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence." We have no idea what evidence, if any, petitioner would, or could, offer in defense of this statute, but this is only because petitioner has had no opportunity to proffer such evidence. Moreover, even assuming that there is no such evidence, petitioner should have the opportunity to present whatever legal arguments he may have in defense of the statute. . . .
 
 
 47
 The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases. We announce no general rule. Certainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt, see Turner v. City of Memphis, 369 U.S. 350 (82 S.Ct. 805, 7 L.Ed.2d 762) (1962), or where "injustice might otherwise result." Hormel v. Helvering, 312 U.S., at 557 (61 S.Ct. at 721, 85 L.Ed.2d at 1041).
 
 
 48
 428 U.S. at 120-21, 96 S.Ct. at 2877, 49 L.Ed.2d at 837 (footnote omitted).
 
 
 49
 Recognizing the wisdom and propriety of the approach articulated in Singleton, this court has adopted an even stricter approach stating that the practice of refusing to address issues that were not passed upon below should be relaxed only "in horrendous cases where a gross miscarriage of justice would occur." Newark Morning Ledger Co. v. United States, 539 F.2d 929, 932 (3d Cir. 1976) (per Mr. Justice Clark).
 
 
 50
 Since I do not believe that the proper resolution of the issues presented by the 1979 Hyde Amendment is beyond any doubt and since I do not believe that allowing the district court to first pass upon the 1979 Hyde Amendment would result in any injustice to the parties or the interests they represent, I would remand this case to the district court to allow the parties to present legal arguments on the 1979 Hyde Amendment and to allow the district court to pass on the effect and, if need be, the constitutionality of the 1979 Hyde Amendment. See Fusari v. Steinberg, 419 U.S. 379, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975) (case remanded for reconsideration in light of intervening changes in the law). At the least, I would request briefing by the parties on the 1979 Hyde Amendment before rendering a binding decision of this court on a matter of such great public importance. However, since the majority has discussed the effect of the 1979 Hyde Amendment, I feel compelled to state my views on this issue.
 
 III.
 
 51
 The majority holds that the 1979 Hyde Amendment, a rider to federal appropriations legislation, substantively alters the obligations of participating states under Title XIX by implicitly amending Title XIX. I cannot agree.
 
 
 52
 Our task as a federal court is to interpret the federal laws and Constitution. Although, when confronted with an unclear or ambiguous statute, we must, to fulfill our obligation, resort to legislative history, such an approach is to be avoided whenever possible due to the inherent unreliability of using legislative history as a basis for ascertaining legislative intent. The best guide to legislative intent when the words of a statute are clear is, of course, the words of the statute. As the Supreme Court recently stated: "When confronted with a statute which is plain and unambiguous on its face, we ordinarily do not look to legislative history as a guide to its meaning." Tennessee Valley Authority v. Hill, 437 U.S. 153, 184 n. 29, 98 S.Ct. 2279, 2296 n. 29, 57 L.Ed.2d 117, 140 (1978). Accord, Ex Parte Collett, 337 U.S. 55, 61, 69 S.Ct. 944, 947, 93 L.Ed. 1207, 1211 (1949) ("there is no need to refer to the legislative history when the statutory language is clear").
 
 
 53
 The 1979 Hyde Amendment is a clear and unambiguous limitation on the expenditure of federal funds for abortion. It states simply that "none of the funds provided by this joint resolution (authorizing appropriations for fiscal year 1980) shall be used to perform abortions" except under certain limited circumstances. The plain meaning of the words which comprise the Hyde Amendment are not subject to doubt or uncertainty. There is nothing whatsoever in the language of the Hyde Amendment which suggests that Congress intended to alter the obligation of participating states under Title XIX. Yet, the majority concludes that "the Hyde Amendment constitutes a substantive modification of Title XIX." Majority op. at 835. I disagree.
 
 
 54
 Other guides to statutory construction also counsel against reading the Hyde Amendment as altering the obligations of participating states under Title XIX. In Morton v. Mancari, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), the Supreme Court reiterated the longstanding rule that repeals by implication are disfavored stating that "courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." Id. at 551, 94 S.Ct. at 2483, 41 L.Ed.2d at 301. The Court further emphasized that " '(t)he intention of the legislature to repeal "must be clear and manifest." ' " Id., quoting United States v. Borden Co., 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181, 190 (1939).
 
 
 55
 Title XIX of the Social Security Act of 1965 and the 1979 Hyde Amendment are fully capable of co-existence. In fact, it is only when the plain and unambiguous language of the Hyde Amendment is ignored that any conflict between the two statutes arises. Far from there being a clear and manifest congressional intention to repeal parts of Title XIX evident in the language of the Hyde Amendment, no such intention is expressed at all. Moreover, the Hyde Amendment, as a rider to federal appropriations legislation, labors under even greater constraints than would a substantive enactment. "(T)he policy (disfavoring repeals by implication) applies with even greater force when the claimed repeal rests solely on an appropriations act. We recognize that both substantive enactments and appropriations measures are 'Acts of Congress,' but the latter have the limited and specific purpose of providing funds for authorized programs." Tennessee Valley Authority v. Hill, supra, 437 U.S. at 190, 98 S.Ct. at 2999-2300, 57 L.Ed.2d at 144. Furthermore, the yearly changes in the language and scope of the Hyde Amendment belie any intention on the part of Congress to alter the obligations of participating states under Title XIX. It is difficult to believe that Congress would, without either committee hearings or reports, change so important a provision of Title XIX. That they would do so with such frequency is even harder to believe.
 
 
 56
 Even when I, contrary to the direction of the Supreme Court in Tennessee Valley Authority and Ex Parte Collett, examine the legislative history of the 1979 Hyde Amendment, I am unable to discern a clearly expressed congressional intention to implicitly repeal parts of Title XIX as Morton requires. At most, we have what Judge Bownes in addressing the 1977 Hyde Amendment characterized as "a statute whose plain meaning is clear and whose congressional history can be construed to mean that a number of congressmen felt that, contrary to what the statute said, it would effect a substantial change in the Medicaid Act." Preterm, Inc. v. Dukakis, supra, 591 F.2d 136 (Bownes, J., dissenting).[3]
 
 
 57
 In addition, to interpret the 1979 Hyde Amendment as substantively altering the obligations of participating states under Title XIX will inevitably require the adjudication of serious questions concerning the constitutionality of the Hyde Amendment. See, e. g., Zbaraz v. Quern, 469 F.Supp. 1212 (N.D.Ill.1979), further consideration of jurisdiction postponed until argument on the merits, 444 U.S. 960, 100 S.Ct. 444, 62 L.Ed.2d 373 (1979); McRae v. Califano, 491 F.Supp. 630 (E.D.N.Y.1980), application for stay of the judgment denied and prob. juris. noted, --- U.S. ----, 100 S.Ct. 1010, 62 L.Ed.2d 749 (1980). It is a well established rule that needless constitutional adjudication is to be avoided, and, toward that end, that when "a construction of the statute is fairly possible by which the (constitutional) question may be avoided," such a construction should be given. Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 348, 56 S.Ct. 466, 483, 80 L.Ed. 688, 711 (1936) (Brandeis, J., concurring), quoting Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598, 619 (1932). As I have stated, I believe such a construction to be not only fairly possible, but required by the plain language of the 1979 Hyde Amendment.
 
 
 58
 The majority argues that to read the Hyde Amendment as only limiting the expenditure of federal funds for abortion and not as also substantively altering the obligations of participating states by implicitly amending Title XIX would lead "to a result which is not consonant with the policies of the Medicaid Act." Majority op. at 835. This, the majority reasons, is because Title XIX is based upon a scheme of cooperative federalism under which the costs of the program are financed jointly by the federal and state governments. I do not quarrel with the majority's characterization of Title XIX as a system of cooperative federalism. However, I disagree with the narrow mold into which the majority requires that a system of cooperative federalism fit.
 
 
 59
 Medicaid, as a program of cooperative federalism, is a program under which states which choose to participate provide, with substantial help from the federal government, medical services to individuals unable to afford such services. No state is required to participate in the program, but those which decide to do so must comply with federal statutory and regulatory standards. However, nowhere does Title XIX require "that there be federal financial participation in every service necessarily provided by a participating state." Doe v. Busbee, 471 F.Supp. 1326, 1333 (N.D.Ga.1979). "Section 1396 does not foreclose, even by intimation, the possibility that a state might be required to fund exclusively one or more services in order to receive the federal appropriations authorized by § 1396." Planned Parenthood Affiliates of Ohio v. Rhodes, 477 F.Supp. 529, 538 (S.D.Ohio 1979) (footnote omitted). In fact, Title XIX abounds with provisions which require participating states to pay for services and bear certain costs without compensation from the federal government. See, e. g., 42 U.S.C. § 1396a(a)(2) & (c) (1976). See also Vargas v. Trainor, 508 F.2d 485 (7th Cir. 1974), cert. denied, 420 U.S. 1008, 95 S.Ct. 1454, 43 L.Ed.2d 767 (1975) (enforcing federal requirement that states pay mandatory state supplement to social security recipients as a condition of continued participation in Title XIX). Although the majority may not think the result which flows from following the language of the Hyde Amendment a sensible one, "in our constitutional system the commitment to the separation of powers is too fundamental for us to pre-empt congressional action by judicially decreeing what accords with 'common sense and the public weal.' " Tennessee Valley Authority v. Hill, supra, 437 U.S. at 195, 98 S.Ct. at 2302, 57 L.Ed.2d at 147.
 
 
 60
 Although not in this case, undoubtedly in the future, the majority's reading of the Hyde Amendment will adversely impact if not, as a practical matter, preclude the exercise by poor women of what the Supreme Court has denominated a fundamental right. See Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Moreover, in this case we are far afield from the question of whether participating states are required to provide nontherapeutic abortions. Cf. Beal v. Doe, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977) (Title XIX does not require participating states to fund nontherapeutic abortions). Rather, we deal here with the far more troubling question of whether the Hyde Amendment relieves participating states from the obligation to provide medically necessary abortions. Before holding that an act of Congress amends an earlier act of Congress so as to withdraw a previously existing requirement that states provide funds for the exercise of a fundamental right whose exercise is necessary to the health of the individual, we should require a clear and explicit statement that this is what Congress intended. However, no such statement appears in the language of the Hyde Amendment. As Judge McManus recently observed:
 
 
 61
 If Congress intends that neither the federal nor state governments fund medically necessary abortions as Medicaid on its face requires, it knows full well how to make its intent clear and manifest by forthrightly amending Medicaid directly. To permit Congress to do less is tantamount to having courts legislate, by judicial interjection under the guise of construction, what Congress has been unable or unwilling to do by clear and manifest enactment.
 
 
 62
 Hodgson v. Board of County Commissioners, 614 F.2d 601, at 607 (8th Cir. 1980) (McManus, J., dissenting).[4]
 
 
 63
 Yet, notwithstanding all this, the majority holds that the 1979 Hyde Amendment substantively alters the obligation of participating states to provide medically necessary abortions by implicitly amending Title XIX. I respectfully disagree.
 
 
 
 [1]
 See Doe v. Beal, 523 F.2d 611 (3d Cir. 1975) (en banc) (holding Title XIX requires state funding of elective abortions), reversed, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977)
 
 
 [2]
 1978 Pa.Laws 16 A, 148. Public Law 148 has been codified at 35 Pa.Stat.Ann. (Purdons) § 6607 (Supp.1979)
 
 
 [3]
 42 U.S.C. § 1396 et seq
 
 
 [4]
 The most recent version of the Hyde Amendment is P.L. 96-123, § 109, 93 Stat. 926 (1979). See footnote 10 infra for a history of the various Hyde Amendments
 
 
 [5]
 The opinion of the district court is reported at 464 F.Supp. 487 (E.D.Pa.1978)
 Three other circuit courts have recently dealt with these issues. Hodgson v. Board of County Commissioners, 614 F.2d 601 (8th Cir. 1980); Preterm, Inc. v. Dukakis, 591 F.2d 121 (1st Cir.), cert. denied, 441 U.S. 952, 99 S.Ct. 2182, 60 L.Ed.2d 1057 (1979); Zbaraz v. Quern, 596 F.2d 196 (7th Cir. 1979). Our reasoning in this appeal is essentially in accord with the reasoning of the First, Seventh and Eighth Circuits.
 On remand in Zbaraz the district court held that the Illinois statute, as modified to conform to the provisions of the fiscal 1979 Hyde Amendment, see note 10 infra, was unconstitutional under the equal protection clause. Zbaraz v. Quern, 469 F.Supp. 1212 (N.D.Ill.1979). This decision was appealed directly to the Supreme Court. The Supreme Court will hear argument in Zbaraz but has specifically postponed final decision on whether it has jurisdiction to decide the merits of the appeal. Zbaraz v. Quern, 444 U.S. 960, 100 S.Ct. 444, 62 L.Ed.2d 373 (1979). The Supreme Court has also recently noted probable jurisdiction of an appeal from a district court decision which sustained a challenge to the constitutionality of the Hyde Amendment itself. McRae v. Califano, 491 F.Supp. 630 (E.D.N.Y.1980), application for stay of enforcement denied and prob. juris. noted, --- U.S. ----, 100 S.Ct. 1010, 62 L.Ed.2d 749 (1980). The Court has decided to hear the arguments in McRae and in Zbaraz together.
 In Reproductive Health Services v. Freeman, 614 F.2d 585 (8th Cir. 1980), the Court of Appeals for the Eighth Circuit held that a state statute which tracked the limitations of the Hyde Amendment violated the equal protection and due process clauses of the U.S. Constitution.
 
 
 [6]
 1978 Pa.Law 16 A. See also 35 Pa.Stat.Ann. (Purdon's) § 6607 (Supp.1979)
 
 
 [7]
 In a separate opinion and order the district court denied a motion by certain doctors and by the legislator who introduced the Pennsylvania legislation for intervention as of right, on the side of defendants, pursuant to Fed.R.Civ.P. 24(a)(2). It also denied a motion by these same parties to be appointed as guardians ad litem, under Fed.R.Civ.P. 17(c), on behalf of the unborn children. Roe v. Casey, 464 F.Supp. 483 (E.D.Pa.1978). The order denying these motions is the subject of the appeal in No. 79-1108
 We affirm the orders of the district court. We agree with the district court that the movants did not have sufficient interest in the litigation to warrant intervention as of right. In addition, we hold that the district court did not abuse its discretion in refusing to appoint guardians ad litem because whatever interests the unborn infants may have, see Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), were adequately represented by the state authorities. See Halderman v. Pennhurst, 612 F.2d 84 (3d Cir. 1979) (en banc).
 
 
 [8]
 In order to qualify for funding under Title XIX, a state must provide at least five basic services to individuals who meet various income requirements. 42 U.S.C. § 1396a(a)(10)(A), (a)(13)(B). In addition, it may provide, and receive funding for, other services enumerated in 42 U.S.C. § 1396d. For a fuller discussion of states' service options under Title XIX, see Eder v. Beal, 609 F.2d 695 (3d Cir. 1979)
 
 
 [9]
 The Court of Appeals for the Eighth Circuit, in holding, inter alia, that Title XIX as originally enacted conflicts with and therefore supersedes Minnesota's statutory restrictions on funding abortions, did not find it necessary to address the issue of whether that Title required states to finance all "medically necessary" services. Hodgson v. Board of County Comm'rs, 614 F.2d at 608 n. 11 (8th Cir. 1980). The court reasoned that the Minnesota statutes would be invalid even under a more narrow reading of Title XIX
 
 
 [10]
 The Hyde Amendment was first enacted in 1976 as a rider to the HEW appropriation for fiscal year 1977. The original provision limited funding to abortions where "the life of the mother would be endangered if the fetus were carried to term." P.L. 94-439, § 209, 90 Stat. 1434 (1976). This provision immediately became subject to a nationwide injunction, and it never took substantive effect. See McRae v. Mathews, 421 F.Supp. 533 (E.D.N.Y.1976), vacated and remanded sub nom., Califano v. McRae, 433 U.S. 916, 97 S.Ct. 2993, 53 L.Ed.2d 1103 (1977)
 In 1977, the Hyde Amendment was again adopted, after extensive debates, for the 1978 fiscal year. P.L. 95-205, § 101, 91 Stat. 1460 (1977). This version expanded funding not only to include the provisions of the earlier Amendment, but also to include abortions for victims of rape and incest as well as "instances where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term when so determined by two physicians." This identical provision was enacted again for the 1979 fiscal year. P.L. 95-480, § 210, 92 Stat. 1586 (1978). It was this version of the Hyde Amendment which was in effect when the Pennsylvania statutes were passed and when the instant lawsuit was brought.
 The current version of the Hyde Amendment was approved on November 20, 1979, for the fiscal year 1980, P.L. 96-123, § 109, 93 Stat. 926 (1979). The 1980 Hyde Amendment differs from its predecessor by providing for one fewer category of abortion funding. The category deleted in the current amendment, and which will no longer be funded, is where "severe and long lasting health damage to the mother would result if the pregnancy were carried to term when so determined by two physicians."
 The Hyde Amendment has once again become subject to a nationwide injunction. McRae v. Califano, 491 F.Supp. 630 (E.D.N.Y. 1980), application for stay of enforcement denied and prob. juris. noted, --- U.S. ----, 100 S.Ct. 1010, 62 L.Ed.2d 749 (1980).
 
 
 [11]
 Because the Pennsylvania statutes were enjoined by the district court when the previous (fiscal year 1979) Hyde Amendment was applicable, we need only consider the impact of the current (fiscal year 1980) Hyde Amendment on the continuing viability of Pennsylvania Public Laws 16A and 148
 Judge Hunter argues, however, that we should not consider the effect of the current (fiscal year 1980) Hyde Amendment because it was not the law when the case was heard in district court. Concurring Op. at 842-843. Apparently, although he does not discuss this course, he would dismiss the case as moot because of the subsequent change in the law. Or, as he does suggest, he would remand to the district court for that court to consider the effect of the new Amendment. What the concurring opinion overlooks, however, is the fact that the district court did not even reach the question of whether the Hyde Amendment modified or amended Title XIX. Thus, the district court had no occasion to discuss the question of whether the Hyde Amendment substantively altered Title XIX. It reasoned that it did not have to do so since the Pennsylvania statutes were more restrictive than the Hyde Amendment. As we discuss infra, such is the case under either the 1979 or the 1980 Hyde Amendments. Thus, Judge Hunter would have us remand to the district court for consideration of an issue which the district court apparently considered irrelevant to its analysis and which, even under the changed circumstances which now exist, would not have altered, and could not alter, the district court's disposition of this case.
 Moreover, we do not consider our treatment of this issue to be contrary to the law of this Circuit. But see Concurring Op. at 841-842. In Newark Morning Ledger Co. v. United States, 539 F.2d 929, 932 (3d Cir. 1976), we stated that we "generally refuse to consider issues that are raised for the first time on appeal." (emphasis added). But this in no way undercuts the Supreme Court's teaching that "(t)he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." Singleton v. Wulff, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). In Singleton, the Supreme Court specifically refrained from enumerating all of the circumstances in which exercising this discretion would be appropriate. Id. at 121 n. 8, 96 S.Ct. at 2877 n. 8. For the reasons discussed in the previous paragraph, we conclude that this is an appropriate instance to exercise this discretion.
 
 
 [12]
 Several district courts have reached the opposite conclusion, however. See, e. g., Planned Parenthood Affiliates v. Rhodes, 477 F.Supp. 529 (S.D.Ohio 1979); Doe v. Busbee, 471 F.Supp. 1326 (N.D.Ga.1979); see also Preterm, supra, 591 F.2d at 134 (Bownes, J., dissenting); Hodgson, supra 614 F.2d at 615 (McManus, J., dissenting)
 A Connecticut statute similar in its provisions to the Pennsylvania statutes involved in this case was just recently invalidated on constitutional grounds. Women's Health Services, Inc. v. Maher, 482 F.Supp. 725 (D.Conn.1980). The district court there also concluded that Title XIX was substantively modified by the 1980 Hyde Amendment. Finally, in what may be the most comprehensive discussion of the Hyde Amendment to date, Judge Dooling in McRae v. Califano, supra, characterized the whole series of Amendments as substantively modifying Title XIX. 491 F.Supp. at 732-733. It appears, however, that we are the first court of appeals to reach this issue under the 1980 Hyde Amendment. But the arguments with respect to this issue are the same in regard to any version of the Hyde Amendment. And, as will be seen infra, so is the conclusion. (Although its opinions were published after the 1980 Hyde Amendment was enacted, the Eighth Circuit considered only the effect of the 1979 Amendment. See Reproductive Health Services, supra; Hodgson v. Board of County Comm'rs, supra.)
 
 
 [13]
 Appellees have identified several instances where state Medicaid expenditures are not matched or reimbursed. But none of these are directly related to the provision of particular services. See 42 U.S.C. § 1396a(a)(2) (requiring states to guarantee all non-federal funding whether or not they are principally responsible for it); id. at § 1396a(a)(18) (prohibiting state liens against benefits correctly paid); id. at § 1396a(c) (Secretary will not approve a plan which reduces benefits); id. at § 1396b(g) (federal benefits will be reduced unless the state maintains effective operational controls). The sections referred to by Appellees appear to be principally concerned with imposing controls and sanctions on state programs. As such they are not apposite to this case. Judge Hunter asserts that "Title XIX abounds with provisions which require participating states to pay for services . . . without compensation from the federal government." Concurring Op. at 844. The concurring opinion, however, points only to two of the provisions which are discussed above, which are inapposite, and does not point to any specific provision whereby a participating state is obliged to pay for services without at least partial federal funding. Nor has our independent research disclosed such a provision
 
 
 [14]
 There are no independent conference reports or committee reports addressed specifically to the Hyde Amendment
 
 
 [15]
 In fact, largely because of the abortion issue, the 1980 budget was not approved in a timely manner. On September 27, 1979, the Senate passed a "continuing resolution" extending funding, pursuant to the old appropriations bills, for 30 days. 125 Cong.Rec. S 13544 (Sept. 27, 1979 daily ed.). The House enacted a similar resolution on the next day. Id. at H 8760 (Sept. 28, 1979 daily ed.). It was not until November 20, 1979 that the final bill was approved. Id. at S 17123 (Nov. 20, 1979 daily ed.)
 
 
 [16]
 Both the Preterm and Zbaraz courts enjoined the state statutes only insofar as they were narrower than the Hyde Amendment. Preterm, 591 F.2d at 134; Zbaraz, 596 F.2d at 203. That remedy was apparently chosen at the behest of the state defendants who argued that if an injunction was to be decreed, it should "correct" the invalidity of the state statutes. See Preterm, 591 F.2d at 134; Zbaraz, 596 F.2d at 202-03. Without commenting on this procedure, we observe that Pennsylvania, in this case, has made no such request. We also recognize that if we were to order a remand, the plaintiffs would be forced to test the constitutionality of a statute which they did not originally challenge. This might create serious jurisdictional problems. See Zbaraz v. Quern, 444 U.S. 960, 100 S.Ct. 444, 62 L.Ed.2d 373 (1979) (Supreme Court reserves question of whether it has jurisdiction to decide constitutional issues raised in this manner). See note 5 supra
 In Hodgson, the Court of Appeals for the Eighth Circuit did not direct the district court to enter an order enjoining the operation of the Minnesota statute only insofar as it did not comply with the Hyde Amendment, because the court had held in a companion case, Reproductive Health Services, supra, that such a state statutory scheme was unconstitutional.
 
 
 [1]
 The term "categorically needy" is used to refer to those classes of individuals specified in 42 U.S.C. § 1396a(a)(10)(A) (1976) and the term "medically needy" is used to refer to those classes of individuals specified in 42 U.S.C. § 1396a(a)(10)(C) (1976). See Beal v. Doe, 432 U.S. 438, 440 n. 1, 97 S.Ct. 2366, 2368 n. 1, 53 L.Ed.2d 464, 469 (1977); 42 C.F.R. § 435 (1979)
 
 
 [2]
 Yet, notwithstanding the district court's discussion of the 1977 Hyde Amendment and its conclusion that the 1977 Hyde Amendment did not substantively alter the obligations of participating states under Title XIX, the majority asserts that "(t)he district court did not reach the question of whether the Hyde Amendment modified or amended Title XIX." Majority op. at 832, 833 n. 11. I am unable to discern upon what the majority bases this statement
 Moreover, I am unable to agree with the majority's assertion that consideration of the 1979 Hyde Amendment by the district court "would not have altered, and could not alter, the district court's disposition of this case." Majority op. 833-834 n. 11. If faced with the more restrictive language of the 1979 Hyde Amendment which, unlike the 1977 Hyde Amendment, does not provide for federal funding of abortions necessary to prevent "severe and long-lasting physical health damage to the mother," the district court would be hard pressed to conclude that "(t)he Hyde Amendment is but a congressional affirmance of the Supreme Court's decision in Doe v. Beal . . . that states need not provide funding for nontherapeutic services, including nontherapeutic abortions." Roe v. Casey, supra, 464 F.Supp. at 502. Whether or not this would have changed the district court's disposition of the case we cannot know. However, it almost certainly would have required the district court to address the question of whether the 1979 Hyde Amendment only curtailed federal funding of abortions or also substantively altered the obligations of participating states under Title XIX.
 
 
 [3]
 The majority properly notes that the House of Representatives passed a resolution which provided, inter alia, that all points of order raised against the 1979 Hyde Amendment for failure to comply with House Rule XXI(2), which prohibits altering existing law in an appropriations measure, would be waived. H.R.Res. 335, 96th Cong., 1st Sess., 125 Cong. Rec. H 5218 (daily ed. June 27, 1979). However, the only purpose of this resolution appears to have been to allow the House to alter the previously existing federal obligation to fund abortions under Title XIX as it did by passing the 1979 Hyde Amendment. Without such a resolution, the only alternatives available would have been to fund all abortions which are required to be funded under Title XIX or none at all. Id. at H 5212-5218
 Even were I to interpret the House resolution as does the majority, I would still be unable to conclude that the Hyde Amendment alters the obligations of participating states since the Senate, which also prohibits substantive legislation in an appropriations measure, Standing Rules of the Senate, Rule XVI(4), passed no corresponding resolution.
 
 
 [4]
 In fact, the House of Representatives recently passed the Child Health Assurance Act of 1979 which, inter alia, amends Title XIX by providing that
 None of the funds authorized to be appropriated under this title shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term: Provided however, That nothing in this title shall be construed to require any State funds to be used to pay for any abortion.
 H.R. 4962, 96th Cong., 1st Sess., 125 Cong. Rec. H 11770 (daily ed. Dec. 11, 1979). The Senate, however, has not yet passed the House amendment to Title XIX. Yet, the majority's rewriting of the plain and unambiguous language of the 1979 Hyde Amendment accomplishes exactly what the Senate has so far been unwilling to do.