OPINION OF THE COURT
COWEN, Circuit Judge.
The Elizabeth Blackwell Health Center for Women, a comprehensive reproductive health care facility that provides first-trimester abortions, the Greater Women’s Medical Fund, a non-profit agency that provides financial assistance to low-income women in order to obtain abortions, and CHOICE, a telephone hot-line which provides information and referrals to its callers on many issues, including family planning and abortion (collectively, the “Providers”), ask this Court to declare invalid and enjoin the enforcement of sections 3215(c) and 3215© of the Pennsylvania Abortion Control Act, 18 Pa. Cons.Stat.Ann. §§ 3201-3220 (1983 & Supp.1994), Pennsylvania’s reporting and physician certification requirements for publicly-funded abortions under the Medicaid program. The Governor of Pennsylvania, the State Treasurer, the Secretary of the Pennsylvania Department of Public Welfare, and the Deputy Secretary for Medical Assistance (collectively, “the Commonwealth”) appeal from the order of the district court granting the Providers’ motion for summary judgment. The district court based its holding on the Providers’ claim that the Pennsylvania statute is preempted by the Hyde Amendment.
We conclude that the Secretary of Health and Human Services is owed deference regarding her interpretation of the Hyde Amendment mandates. Because the Secretary has determined that reporting requirements are permissible under the Medicaid Act, as modified by the Hyde Amendment, only if they contain a waiver provision, and since the Pennsylvania Abortion Control Act contains no such provision, we find § 3215© of the Pennsylvania statute directly in conflict with federal law, and thus, invalid to the extent that it conflicts with the Secretary’s interpretation. Furthermore, because the second-physician certification requirement pursuant to § 3215(c) is contrary to a federal regulation, it is also invalid to the extent that it goes beyond the scope of that regulation.
I.
This action concerns Title XIX of the Social Security Act, commonly known as the Medicaid program, 42 U.S.C. §§ 1396-1396u (1988 & Supp. V 1993). The purpose of the Medicaid program is to help provide medical treatment for low-income people. Under the program, the state receives federal financial assistance in return for administering a Medicaid program that the state develops within parameters established by federal law and regulations. 42 C.F.R. § 430.0 (1994).
Establishment of a Medicaid program is voluntary on the part of each state. While states are not obligated to participate in the Medicaid program, each state that chooses to do so is required to develop its own state plan which must be approved by the Secretary. In order to receive federal funds, a state’s plan must conform, both on its face and as applied, with various federal requirements. 42 U.S.C. § 1396a, 1396c; see Har *173 ris v. McRae, 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980); New Jersey v. Department of Health and Human Services, 670 F.2d 1284, 1286 (3d Cir.), cert. denied, 459 U.S. 824, 103 S.Ct. 56, 74 L.Ed.2d 60 (1982).
Under Title XIX, certain categories of medical care are mandatory, and must be provided by every state Medicaid plan, while other categories of care are optional, and each state has the discretion to cover the service. See 42 U.S.C. § 1396a(a)(10). By law, states are required to fund medically necessary physician services. 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a). Participating states must establish eligibility requirements that are “consistent with the objectives” of Title XIX. 42 U.S.C. § 1396a(a)(17). “Title XIX’s broadly stated primary objective [is] to enable each State, as far as practicable, to furnish medical assistance to individuals whose ineome and resources are insufficient to meet the costs of necessary medical services.” Beal v. Doe, 432 U.S. 438, 444, 97 S.Ct. 2366, 2371, 53 L.Ed.2d 464 (1977) (citing 42 U.S.C. §§ 1396,1396a(a)(10)). “A further objective is that policies governing eligibility be in the ‘best interests’ of the recipient.” Hodgson v. Board of County Commissioners, County of Hennepin, 614 F.2d 601, 607 (8th Cir.1980) (citing 42 U.S.C. § 1396a(a)(19); 45 C.F.R. § 206.10(a)(ll)). The state must also provide safeguards to assure that its Medicaid plan will be administered “in a manner consistent with simplicity of administration.” 42 U.S.C. § 1396a(a)(19). On the other hand, the state must “provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization.” 42 U.S.C. § 1396a(a)(30)(A).
In addition, federal regulations require that each covered service be “sufficient in amount, duration, and scope to reasonably achieve its purpose,” 42 C.F.R. § 440.230(b) (1994), and mandate that states “may not arbitrarily deny or reduce the amount, duration, or scope of a required service ... to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition.” 42 C.F.R. § 440.230(c).
If, after a hearing, the Secretary finds that an approved state plan no longer complies with the provisions of the Medicaid Act, or that the state had failed to comply substantially with any applicable federal requirement, the Secretary may notify the state that federal financial participation will be withheld or limited. 42 U.S.C. § 1396c.
In 1976, Congress passed what is commonly called the Hyde Amendment, which prohibits federal reimbursement for abortions except in the narrow circumstances that Congress deems to be medically necessary. Since 1976, Congress has added the Hyde Amendment to annual appropriations bills for the U.S. Department of Health and Human Services (“HHS”). While its provisions have varied to some degree from year to year, the effect of the Hyde Amendment has been to withdraw federal funding under Medicaid for most abortions.[1]
The Hyde Amendment for fiscal year 1994 permitted, for the first time since 1981, expenditure of federal funds for abortions when “the pregnancy is the result of an act of rape or incest” as well as when “necessary to save the life of the mother.” Pub.L. No. 103-112, § 509, 107 Stat. 1082, 1113 (1993). The full version of the 1994 Hyde Amendment provides:
None of the funds appropriated under this Act shall be expended for any abortion except when it is made known to the Fed *174 eral entity or official to which funds are appropriated under this Act that such procedure is necessary to save the life of the mother or that the pregnancy is the result of an act of rape or incest.

Id.

[2]

This Court has previously held that the Medicaid statute, as modified by the Hyde Amendment, requires participating states to fund those abortions for which federal reimbursement is available. Roe v. Casey, 623 F.2d 829, 836-37 (3d Cir.1980). See also Hodgson, 614 F.2d at 605; Preterm, Inc. v. Dukakis, 591 F.2d 121, 134 (1st Cir.), cert. denied, 441 U.S. 952, 99 S.Ct. 2182, 60 L.Ed.2d 1057 (1979). We are bound by that precedent here. Accordingly, under Medicaid, funding for rape and incest abortions is mandatory for participating states.
The 1994 Hyde Amendment was reported out of committee with a provision requiring women seeking reimbursement for rape and incest abortions to report the crimes to the appropriate law enforcement officials. 139 Cong.Rec. H4304 (daily ed. June 30, 1993) (§ 207). However, a point of order was raised that the Hyde Amendment language violated parliamentary procedure of the House of Representatives, which prohibits attempts to “legislate” on an appropriations bill. The point of order was conceded and the entire amendment stricken from the bill. 139 Cong.Rec. H4307-08.
The Secretary of HHS has delegated her authority to oversee and enforce the Medicaid program to the Health Care Financing Administration (“HCFA”). 49 Fed.Reg. 35,-247, 35,249 (1984). HCFA has promulgated a regulation that provides:
[Federal funding] is available in expenditures for an abortion when a physician has found, and certified in writing to the Medicaid agency, that on the basis of his professional judgment, the life of the mother would be endangered if the fetus were carried to term.
42 C.F.R. § 441.203 (1994).
In addition, on December 28, 1993, HCFA issued a directive to state Medicaid directors, explaining:
The purpose of this letter is to notify [state Medicaid directors] about a recent Con-gressionally enacted revision to the “Hyde Amendment” which affects the Medicaid program and to tell you how this revision in the law is to be implemented.
As with all other mandatory medical services for which Federal funding is available, States are required to cover abortions that are medically necessary. By definition, abortions that are necessary to save the life of the mother are medically necessary. In addition, Congress this year added abortions for pregnancies resulting from rape and incest to the category of medically necessary abortions for which funding is provided. Based on the language of this year’s Hyde Amendment and on the history of Congressional debate about the circumstances of victims of rape and incest, we believe that this change in the text of the Hyde Amendment signifies Congressional intent that abortions of pregnancies resulting from rape or incest are medically necessary in light of both medical and psychological health factors. Therefore, abortions resulting from rape or incest should be considered to fall within the scope of services that are medically necessary.
The definition of rape and incest should be determined in accordance with each State’s own law. States may impose reasonable reporting or documentation requirements on recipients or providers, as may be necessary to assure themselves that an abortion was for the purpose of terminating a pregnancy caused by an act of rape or incest. States may not impose reporting or documentation requirements that deny or impede coverage for abortions where pregnancies result from rape or incest. To insure that reporting requirements do not prevent or impede coverage for covered abortions, any such reporting requirement must be waived and the procedure consid *175 ered to be reimbursable if the treating physician certifies that in his or her professional opinion, the patient was unable, for physical or psychological reasons, to comply with the requirement.
By March 31, 1994, all States must ensure that their State Plans do not contain language that precludes [federal funding] for abortions that are performed to save the life of the mother or to terminate pregnancies resulting from rape or incest.
Letter, from Sally K. Richardson, Director, Medicaid Bureau, to All State Medicaid Directors (Dec. 28, 1993) (emphasis added), App. at 92-93.[3]
However, under the Pennsylvania Abortion Control Act, no federal or state funds can be provided for the termination of pregnancies caused by rape or incest unless the state agency: (1) obtains a statement from the physician performing the abortion that the woman was a victim of rape or incest and that she personally reported the crime to the appropriate law enforcement agency together with the name of the offender; (2) obtains from the physician the woman’s signed statement to that effect; and (3) verifies the reporting of the crime with the appropriate law-enforcement agency. 18 Pa.Cons.Stat. Ann. § 3215(3) (Supp.1994).[4] The Pennsylvania Abortion Control Act does not contain a waiver provision.
In addition, in eases where carrying the fetus to term would endanger the life of the mother, the Pennsylvania Act provides that no state or federal funds can be expended unless the danger is certified by a physician who is not the physician who will perform the abortion and who has no financial interest in *176 the procedure. 18 Pa.Cons.Stat.Aim. § 3215(c) (Supp.1994).[5]
The Providers commenced this challenge to sections 3215(c) and 3215(j) of the Pennsylvania Abortion Control Act, on their own behalf and on behalf of Medicaid-eligible rape and incest victims and Medicaid-eligible women whose lives are endangered but who cannot obtain second-physician certification. The Providers argued in the district court that the Commonwealth’s reporting and certification requirements are inconsistent with the Hyde Amendment, and therefore invalid under the Supremacy Clause of the United States Constitution.[6]
The district court granted the Providers’ motion for summary judgment on the Supremacy Clause claim. Elizabeth Blackwell Health Center for Women v. Knoll, No. 94-0169, slip op. at 5, 1994 WL 512365 (E.D.Pa. Sept. 15, 1994). Relying on our decision in Roe v. Casey, 623 F.2d 829 (3d Cir.1980), the district court first acknowledged that Pennsylvania must cover all abortions for which federal reimbursement is provided under the Hyde Amendment. The court then reasoned:
whereas the Hyde Amendment restricts abortion funding to cases of rape or incest, or where continuation of the pregnancy would endanger the life of the mother, the Pennsylvania statute imposes additional limitations. To the extent of these additional limitations, therefore, the Pennsylva-nía statute is invalid, under familiar preemption principles.
Id. at 3.
The district court also found support for its holding in the fact that “the same kinds of reporting and certification requirements set forth in the Pennsylvania statute had appeared in earlier versions of the Hyde Amendment. They were removed in the current version, and efforts by abortion opponents to include them were rejected by Congress.” Id. at 4 (citation omitted). The district court thus concluded that the legislative history indicates congressional intent to eliminate the reporting requirements. Id. at 5. Further, the district court also held that the crime-fighting and other interests advanced by the Commonwealth to justify the challenged provisions were inconsistent with the purposes of the Medicaid Act and were therefore impermissible. Id. at 4.
The district court enjoined the Commonwealth from enforcing sections 3215(c) and 3215(j) of the Pennsylvania Abortion Control Act. This appeal followed. This Court granted the Commonwealth’s motion to stay the order of the district court pending appeal, and the Providers’ request to expedite this appeal. We requested the Secretary of HHS to address as amicus the issue of the extent to which a state can require reporting and second-physician certification under the Medicaid Act and the Hyde Amendment in order for a woman to be entitled to an abortion.
*177 II. REPORTING REQUIREMENTS FOR RAPE OR INCEST
The Secretary of HHS, who administers the Medicaid program, has interpreted the Medicaid statute as modified by the 1994 Hyde Amendment, to provide that, absent a waiver provision, reporting requirements for rape or incest abortions unduly impede or deter a woman’s exercise of her right to the medically necessary procedure. Letter, (Dee. 28, 1993), App. at 93; Letter, (Mar. 25, 1994), App. at 117. The Secretary does not regard reporting requirements as per se invalid. Id. If this judgment is a reasonable exercise of the Secretary’s discretion, it is entitled to due deference. Our inquiry is therefore focused upon whether the Secretary’s interpretation warrants our deference.
A.
The Commonwealth disputes both the Secretary’s and the district court’s interpretations of the Hyde Amendment mandates regarding reporting requirements. The Commonwealth maintains that its requirements are valid and should be upheld in their entirety.
The Commonwealth acknowledges that under the Medicaid program, states are free to participate or not as they see fit, but if a state does elect to participate, it must comply with the conditions that Congress has set. The Commonwealth, however, citing Pennhurst State School and Hospital v. Holderman, 451 U.S. 1, 17, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981), argues that in setting those conditions, “Congress [must] speak with a clear voice.” It contends that a program like Medicaid:
is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions .... There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously. [Pennhurst, 451 U.S. at 17, 101 S.Ct. at 1540 (citation and footnote omitted).]
The Commonwealth maintains that on its face, the 1994 Hyde Amendment is a simple prohibition on the use of federal money for certain specified purposes. It sets neither requirements nor prohibitions on the states; it says nothing explicit about reporting or certification procedures. The Commonwealth concludes that the principles articulated in Pennhurst, when applied to this case, require that the district court’s holding be reversed because it cannot reasonably be said that Congress has “unambiguously” forbidden reporting and certification requirements such as those contained in the Pennsylvania law.
The Commonwealth’s reliance on Penn-hurst is misplaced. Pennhurst involved the obligations of states under the federal Developmentally Disabilities Assistance and Bill of Rights Act, 42 U.S.C. §§ 6000-6081 (“DDA-BRA”). In reversing our holding that the “bill of rights” provision of the DDABRA created enforceable rights and obligations, the Supreme Court found no evidence that Congress intended to condition the grant of federal funds on the states’ “assum[ing] the high cost of providing ‘appropriate treatment’ in the ‘least restrictive environment’ to their mentally retarded citizens.” 451 U.S. at 18, 101 S.Ct. at 1540. The Court reasoned that because Congress failed to speak clearly regarding the state’s obligations, it could not “fairly say that the State could make an informed choice” about participation in the joint program. Id. at 25, 101 S.Ct. at 1544.
Here, the Medicaid Act by its terms requires state Medicaid plans to cover all medically necessary services that fall -within the mandatory areas of care. See 42 U.S.C. § 1396a(a)(10)(A). Moreover, nearly fifteen years ago, we made clear in Roe v. Casey, that states participating in the Medicaid program must provide the abortion services that are enumerated in the Hyde Amendment. 623 F.2d at 836-37. The 1994 Hyde Amendment plainly puts participating states on notice of their obligations to fund abortions where necessary to save a woman’s life or where the pregnancy is the result of rape or incest. Accordingly, the Commonwealth was given clear notice that, if it elected to continue to participate in the Medicaid program, it *178 was obligated to provide funding for such abortions. Furthermore, any participating state should have realized that reporting requirements could be so onerous as to defeat Congress’ intent that Medicaid funding be provided for the categories of abortions in question. Unlike the claims of the defendants in Pennhurst, the Commonwealth cannot reasonably claim that it was unaware of its obligations under the Medicaid Act, as modified by the Hyde Amendment and its implementing regulations. As such, the Secretary is reasonable in interpreting the Hyde Amendment to prohibit reporting requirements that operate as additional coverage requirements to deny or impede some women from receiving the mandated abortion services.
The Commonwealth further maintains that other provisions of Title XIX authorize the challenged provisions. Participating states are required to adopt “reasonable standards ... for determining eligibility for and the extent of medical assistance.” 42 U.S.C. § 1396a(a)(17). States are likewise required to adopt “such safeguards as may be necessary to assure that eligibility for care and services under the plan will be determined, and such care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients.” 42 U.S.C. § 1396a(a)(19). Additionally, states must “provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization.” 42 U.S.C. § 1396a(a)(30)(A). Moreover, the current version of the Hyde Amendment requires states to “make known” to the Secretary that the abortion for which funding is sought is one in which the life of the mother is endangered or where the pregnancy resulted from rape or incest. The Commonwealth argues that Pennsylvania’s reporting and certification procedures further these statutory mandates.
In her amicus brief, the Secretary acknowledges that Congress intended that states be allowed flexibility in developing procedures for administering their statutory obligations under the Medicaid statute and their state plans. Amicus Brief at 20 (citing Schweiker v. Hogan, 457 U.S. 569, 590-93, 102 S.Ct. 2597, 2610-11, 73 L.Ed.2d 227 (1982) (a state has the option to provide partial benefits to the medically needy); Mississippi Hospital Ass’n, Inc. v. Heckler, 701 F.2d 511, 515 (5th Cir.1983) (Congress intended states to be free to experiment with methods and standards of payment under their Medicaid plans)). The Secretary’s regulations have long recognized that states have discretion to impose reasonable coverage limits, consistent with the objectives of the Act, on the amount, duration, and scope of services, particularly with respect to ensuring “utilization control.” 42 C.F.R. § 440.230(b), (d). Indeed, the Secretary acknowledges that while states are not required to adopt reporting requirements, properly tailored reporting requirements can serve the purposes of the Medicaid Act and the Hyde Amendment.
However, in reconciling these eligibility requirements of the Medicaid statute with the language and history of the Hyde Amendment, and with the other purposes of the Medicaid program, the Secretary maintains that state-established reporting requirements “may not serve as an additional coverage requirement to deny or impede payment for abortions where pregnancies result from rape or ince[s]t.” Letter, (Mar. 25, 1994), App. at 117. The Secretary has thus concluded that reasonable reporting requirements are valid only if they contain a waiver provision.
B.
The Providers argue that the district court correctly held that the Supremacy Clause requires the invalidation of Pennsylvania’s reporting and second-physician certification requirements because they directly conflict with federal law. The Supremacy Clause requires invalidation of any state constitutional or statutory provision that conflicts with federal law, see Reynolds v. Sims, 377 U.S. 533, 584, 84 S.Ct. 1362, 1393, 12 L.Ed.2d 506 (1964), and compels compliance by participants in Title XIX federal aid programs with federal law and regulations. King v. Smith, 392 U.S. 309, 316-17, 88 S.Ct. *179 2128, 2133, 20 L.Ed.2d 1118 (1968); Roe v. Casey, 623 F.2d at 837.
The Providers maintain that the district court properly relied on Roe v. Casey in holding that all state Medicaid programs must fund all abortions for which federal funds are available. In Roe v. Casey, we invalidated an earlier version of Pennsylvania’s Medicaid funding restriction that proscribed coverage of abortions except when necessary to save the life of the pregnant woman. The then-applicable Hyde Amendment, like the 1994 Hyde Amendment, permitted the expenditure of funds for abortion where a pregnancy resulted from rape or incest, as well as in life-threatening circumstances. We reasoned:
Title XIX, as now modified [by the current Hyde Amendment], requires the states to fund abortions in two categories: where the mother is endangered and where the pregnancy was the result of rape or incest. Pennsylvania ... would not fund the second category. Because Pennsylvania’s statutes are not consistent with the modified Title XIX it is clear that, as written, they cannot stand.
Id. at 836-37.
The Providers argue that the district court correctly concluded that Pennsylvania’s effort to restrict its Medicaid coverage of abortion to eases of reported rape and incest and dually-certified life endangerment runs directly contrary to Roe v. Casey’s mandate that Pennsylvania must fund all abortions for which federal funds are available. According to the Providers, the Pennsylvania reporting requirements would be invalid under Roe v. Casey even if they contained a waiver provision.
We agree that Roe v. Casey holds that the Hyde Amendment establishes a mandatory floor of required services, below which states may not fall. Under its ruling, all women who are eligible must receive the benefits that have been made available to them by Congress. The question with which we are faced today focuses on the issue of eligibility requirements that are utilized by states to determine whether a woman is entitled to the services enumerated in the Hyde Amendment. Roe v. Casey indicates that these eligibility requirements cannot be so onerous that they inhibit or deter women who are eligible to receive the abortion services from receiving them. Roe v. Casey does not, however, per se invalidate all reporting requirements used for eligibility purposes.
The Providers further argue that the legislative history provides a clear indication of congressional intent to prohibit the reporting and certification requirements contained in the Pennsylvania statute. The Providers note that in past versions of the Hyde Amendment, Congress had specifically included reporting requirements for rape and incest victims, and contained second-physician requirements for abortions in cases of severe and long-lasting physical health damage. See Pub.L. No. 96-536, § 109, 94 Stat. 3166, 3170 (1980) (1981 Hyde Amendment) (providing funding for rape or incest victims “when such rape has been reported within seventy-two hours to a law enforcement agency or public health service”); Pub.L. No. 96-123, § 109, 93 Stat. 923, 926 (1979) (1980 Hyde Amendment) (providing Medicaid funded abortions for rape or incest victims “when such rape or incest has been reported promptly to a law enforcement agency or public health service”); Pub.L. No. 95-480, § 210, 92 Stat. 1567, 1586 (1978) (1979 Hyde Amendment) (restricting Medicaid funding in cases of severe and long-lasting health damage to those cases “so determined by two physicians”); Pub.L. No. 95-205, § 101, 91 Stat. 1460 (1977) (1978 Hyde Amendment) (same). Additionally, in 1993, Congress considered but rejected a version of the 1994 Hyde Amendment that contained such a requirement. See 139 Cong.Rec. H4304 (daily ed. June 30, 1993) (showing previous version of amendment which included reporting requirement). The Providers contend that the district court properly inferred that, in repudiating previous versions of the Hyde Amendment, Congress clearly intended to eliminate provisions such as those at issue here.
The district court’s reading of the legislative history goes too far. While Congress clearly no longer requires the states to implement reporting and certification procedures, it does not follow that states are now *180 forbidden to have them. At most, the rejection of the earlier versions of the Hyde Amendment is a sign that Congress did not wish to mandate reporting requirements on the states. Cf. John Hancock Mutual Life Ins. Co. v. Harris Trust & Sav. Bank, — U.S. —, —, 114 S.Ct. 517, 524, 126 L.Ed.2d 526 (1993) (courts are guided by the statute’s words, not by discarded draft legislation). Moreover, we note that Congress’ rejection of the reporting requirements for the 1994 Hyde Amendment was expressly based on procedural considerations. See 139 Cong.Ree. H4307-08. A rejection on procedural grounds provides no basis, for any inference regarding Congress’ views about the substantive provisions of the legislation. We are therefore left with no guidance from the legislative history.
C.
We are thus faced with competing interests within the Medicaid statute as amended by the 1994 Hyde Amendment. On one hand, the Pennsylvania reporting requirements that require a physician’s averment setting forth that the woman signed a statement that her pregnancy was the result of rape or incest can be defended on the ground that they further the state’s interest under the Hyde Amendment in being able to “make known” to the Secretary that an abortion was performed upon a woman’s representation that the pregnancy was the result of rape or incest. The requirement under Pennsylvania law that a woman report the rape or incest to law enforcement agencies can be defended as an attempt to ensure that the woman’s representations are true as a part of the state’s obligation to “safeguard against unnecessary utilization.” 42 U.S.C. § 1396a(a)(30)(A).
On the other hand, however, the Supreme Court has held that a state law that establishes benefit eligibility criteria for a federal program that are more restrictive than the criteria established by Congress is invalid. King v. Smith, 392 U.S. 309, 333, 88 S.Ct. 2128, 2141, 20 L.Ed.2d 1118 (1968). Likewise, our decision in Roe v. Casey sets a mandatory floor of services that must be provided by the states under the Medicaid Act, as modified by the Hyde Amendment, which cannot be undermined by onerous reporting requirements. Furthermore, § 1396a(a)(19) requires that the state provide safeguards to assure that the plan will be administered “in a manner consistent with simplicity of administration and the best interests of the recipients.”[7]
It can reasonably be argued that the Pennsylvania reporting requirements are inconsistent with this mandate because they create a formidable barrier for some women who would otherwise be eligible to obtain abortions in cases of rape and incest. The Pennsylvania statute creates numerous hurdles for rape and incest victims: (1) a woman must personally report the incident of rape or incest to state law enforcement authorities, together with the name of the offender; (2) physicians are required to aver that they have obtained a signed statement from the pregnant woman verifying that she is pregnant as a result of rape or incest, that she complied with the reporting requirements, and that she is aware that false reporting is punishable by law; and (3) the Commonwealth must verify with a law enforcement agency or child protective service agency that the report was made. It can reasonably be argued that these requirements can be insurmountable for a victim of rape or incest *181 who may be traumatized by the event. We are aware that rape is a vastly underreported crime, and it can be reasonably argued that reporting requirements such as Pennsylvania’s can substantially deter some women from receiving services intended to be available to them under the statute.
The Secretary of HHS bears the responsibility of reconciling these competing interests in the statute. The Supreme Comí; has noted that “[p]erhaps appreciating the complexity of what it had wrought, Congress conferred on the Secretary exceptionally broad authority to prescribe standards for applying certain sections of the [Medicaid] Act.” Schweiker v. Gray Panthers, 453 U.S. 34, 43, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981). The Secretary has concluded that these competing interests are best reconciled if state reporting requirements contain a waiver provision allowing a treating physician to certify that the woman was unable to comply with reporting requirements for physical or psychological reasons.
The Director of HCFA explained this point in her December 1993 directive to all state Medicaid directors:
As with all other mandatory medical services for which Federal funding is available, States are required to cover abortions that are medically necessary.... States may impose reasonable reporting or documentation requirements on recipients or providers, as may be necessary to assure themselves that an abortion was for the purpose of terminating a pregnancy caused by an act of rape or incest. States may not impose reporting or documentation requirements that deny or impede coverage for abortions where pregnancies result from rape or incest. To insure that reporting requirements do not prevent or impede coverage for covered abortions, any such reporting requirement must be waived and the procedure considered to be reimbursable if the treating physician certifies that in his or her professional opinion, the patient was unable, for physical or psychological reasons, to comply with the requirement.
Letter, (Dec. 28, 1993), App. at 93. See also Letter, (Mar. 25,1994), App. at 117 (reiterating the need for waiver provision in state-established reporting requirements).
Under the Secretary’s interpretation, physicians may take into account both the immediate and long-term psychological consequences of reporting rape or incest to authorities that could leave a woman unable to fulfill those reporting requirements. A waiver thus ensures that reporting requirements do not prevent or impede coverage for covered abortions. Without Pennsylvania’s assurance that it will waive the reporting requirements if the woman is physically or psychologically unable to comply, the Pennsylvania Abortion Control Act requirements comprise impermissible eligibility criteria.
The December 1993 HCFA directive constituted the Secretary’s attempt to give interpretive guidance to the states in advance of their submission of state Medicaid plans.[8] The HCFA directive is an interpretation of the Hyde Amendment mandates as reconciled with the competing interests within the Medicaid statute. Since the directive clarifies and explains existing law, we deem it “interpretive.” See Bailey v. Sullivan, 885 F.2d 52, 62 (3d Cir.1989) (“If the rule in question merely clarifies or explains existing law or regulations, it will be deemed interpretive.”); American Min. Congress v. MSHA, 995 F.2d 1106, 1112 (D.C.Cir.1993) (setting out factors to distinguish between legislative and interpretive rules). As an interpretive rule, the Secretary’s pronouncements are exempted from the APA notice- and-comment requirements. 5 U.S.C. § 553(b)(A) (notice requirement does not apply “to interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice”). This Court and the Supreme Court have upheld the validity of *182 interpretive rules. Bailey, 885 F.2d at 62; Shalala v. Guernsey Memorial Hospital, — U.S. —, —, 115 S.Ct. 1232, 1237, 131 L.Ed.2d 106 (1995).
Courts have long recognized that “considerable weight” must be conferred to an executive department’s construction of a statutory scheme which it is entrusted to administer. The Supreme Court has announced that the principle of deference to administrative interpretation:
has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations.... If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency’s care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.
Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 844-45, 104 S.Ct. 2778, 2782-83, 81 L.Ed.2d 694 (1984) (citations omitted). Such deference is appropriate here even though the Secretary’s interpretation is not contained in a “legislative rule.” See, e.g., Health Insurance Ass’n of America v. Shalala, 23 F.3d 412, 424 (D.C.Cir.1994); Hicks v. Cantrell, 803 F.2d 789, 791-92 (4th Cir.1986). Indeed, the Supreme Court recently reversed our decision in Koray v. Sizer, 21 F.3d 558, 562-65 (3d Cir.1994), where we had declined to defer to the Bureau of Prisons’ interpretation of 18 U.S.C. § 3585(b). The Supreme Court explained:
The Bureau, as the agency charged with administering the credit statute ... has interpreted § 3585(b)’s “official detention” language to require credit for time spent by a defendant under a § 3142(e) “detention order”.... As we have explained, ... the Bureau’s interpretation is the most natural and reasonable reading of § 3585(b)’s “official detention” language.
It is true that the Bureau’s interpretation appears only in a “Program Statement”— an internal agency guideline — rather than in “published regulations subject to the rigors of the Administrative Procedure] Act, including public notice and comment.” 21 F.3d at 562. But BOP’s internal agency guideline, which is akin to an “interpretive rule” that “do[es] not require notiee-and-comment,” Shalala v. Guernsey Memorial Hospital, 514 U.S. —, — [115 S.Ct. 1232, 1239, 131 L.Ed.2d 106] (1995) (slip op., at 11), is still entitled to some deference, cf., Martin v. Occupational Safety and Health Review Comm’n, 499 U.S. 144, 157 [111 S.Ct. 1171, 1179, 113 L.Ed.2d 117] (1991), since it is a “permissible construction of the statute.” Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 [104 S.Ct. 2778, 2782, 81 L.Ed.2d 694] (1984).
Reno v. Koray, — U.S. —, -—, 115 S.Ct. 2021, 2026-27, 132 L.Ed.2d 46 (1995) (footnote omitted).
The Secretary’s reconciliation of the competing interests in the Medicaid statute and Hyde Amendment is reasonable. Because the Secretary’s consistent and contemporaneously expressed construction of the Medicaid statute as amended by the Hyde Amendment is a reasonable one, it is accorded considerable weight under principles announced in Chevron.
Accordingly, we will defer to the Secretary’s interpretation of the Hyde Amendment, and hold that because the Pennsylvania reporting requirements lack a waiver procedure and therefore may deprive eligible women of the benefits which Congress has made available to them, they are to this extent in conflict with federal law and are invalid. See Louisiana Public Service Comm’n. v. F.C.C., 476 U.S. 355, 368-69, 106 S.Ct. 1890, 1898-99, 90 L.Ed.2d 369 (1986) (under the Supremacy Clause, a federal agency acting within the scope of its congres-sionally delegated authority has the power to preempt state regulation and render unenforceable state laws). Thus, until Pennsylvania, pursuant to state law, adopts a waiver provision in accordance with the Secretary’s directive, the Commonwealth is enjoined *183 from enforcing its rape and incest reporting requirements.
III. SECOND PHYSICIAN CERTIFICATION REQUIREMENTS
Like reporting requirements for abortions where pregnancies result from rape or incest, certification requirements for abortions necessary to save the life of the mother are not expressly addressed in the Hyde Amendment. However, pursuant to the broad authority to promulgate regulations in administering the Medicaid program, see, e.g., Schweiker, 453 U.S. at 43, 101 S.Ct. at 2640, the Secretary, shortly after the passage of the first Hyde Amendment in 1977, promulgated a regulation concerning abortions where the mother’s life was endangered. The regulation provides:
[Federal funding] is available in expenditures for an abortion when a physician has found, and certified in writing to the Medicaid agency, that on the basis of his professional judgment, the life of the mother would be endangered if the fetus were carried to term.
42 C.F.R. § 441.203 (emphasis added). This regulation has not been altered in substance since its initial promulgation.
The Secretary construes this regulation to provide if any physician — including a woman’s attending physician — certifies that the life of the mother would be endangered, federal funding is “available.” Consistent with our holding in Roe v. Casey that states are required by the Medicaid Act to fund all abortion services that are allowed under the Hyde Amendment, the Secretary concludes that a state regulation that attempts, in effect, to require a second physician’s certification in addition to a certification given by “a physician” is inconsistent with the regulation.
We must give substantial deference to an agency s construction of its own regulation. Martin v. Occupational Safety and Health Review Comm’n, 499 U.S. 144, 150-51, 111 S.Ct. 1171, 1175-76, 113 L.Ed.2d 117 (1991); Lyng v. Payne, 476 U.S. 926, 939, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986). As the Supreme Court recently announced, courts “must defer to the Secretary’s interpretation unless an ‘alternative reading is compelled by the regulation’s plain language or by other indications of the Secretary’s intent at the time of the regulation’s promulgation.’” Thomas Jefferson University v. Shalala, — U.S. —, —-—, 114 S.Ct. 2381, 2386-87, 129 L.Ed.2d 405 (1994) (quoting Gardebring v. Jenkins, 485 U.S. 415, 430, 108 S.Ct. 1306, 1314, 99 L.Ed.2d 515 (1988)).[9]
We believe that the Secretary’s construction comports with the plain language of the regulation. The phrase “[Federal funding] is available ... for an abortion when a physician has found and certified [that the mother’s life is endangered]” does not limit the class of physicians who have the authority to certify. We believe that this reading of the regulation gives the phrase “a physician” its ordinary and natural meaning. See F.D.I.C. v. Meyer, — U.S. —, —-—, 114 S.Ct. 996, 1001, 127 L.Ed.2d 308 (1994) (“[W]e construe a statutory term in accordance with its ordinary or natural meaning.”).
Further, the history of the physician certification regulation indicates that the Secretary intended this construction at the time of the regulation’s promulgation. The 1976 Hyde Amendment provided for federal funding “where the life of the mother would be endangered if the fetus were earned to term.” Pub.L. No. 94^39, § 209, 90 Stat. 1418, 1434 (1976). The 1976 Hyde Amendment did not require a physician’s certifiea *184 tion. The Secretary issued a notice of proposed rule-making which stated that:
the Department will provide Federal financial participation in the cost of abortions only where the attending physician, on the basis of his or her professional judgment, has certified that the abortion is necessary because the life of the mother would be endangered if the fetus were carried to term.
42 Fed.Reg. 40486 (1977) (emphasis added). The Secretary construed this notice as meaning that “in the absence of fraud, the physician’s judgment would be conclusive.” 43 Fed.Reg. 4574 (1978).
In enacting the 1977 Hyde Amendment, Congress retained the 1976 Hyde Amendment language concerning funding for abortions when the mother’s life is endangered. Pub.L. No. 95-205, § 101, 91 Stat. 1460 (1977). The Secretary concluded that the failure of Congress to question the manner in which the Secretary had previously implemented the exception, and its reenactment without change, should be understood as congressional approval of the Secretary’s interpretation. 43 Fed.Reg. 4574. Thus, notwithstanding Congress’ silence, the Secretary’s 1977 implementing regulations construed the intent of Congress to be that certification of life endangerment by a physician should be required. 43 Fed.Reg. 4570 (§ 50.304). Accordingly, the Secretary’s construction of her regulation, 42 C.F.R. § 441.203, as providing for federal funding when “any physician” — including a woman’s attending physician — certifies that the life of the mother would be endangered, is consistent with the history of the regulation.
The Secretary’s construction is also consistent with other requirements of Title XIX and its implementing regulations. Section 1396a(a)(17) mandates that states establish eligibility requirements that are “consistent with the objectives” of Title XIX. 42 U.S.C. § 1396a(a)(17). In Beal v. Doe, the Supreme Court explained that “Title XIX’s broadly stated primary objective [is] to enable each state, as far as practicable, to furnish medical assistance to individuals whose income and resources are insufficient to meet the costs of necessary medical services.” Beal v. Doe, 432 U.S. 438, 444, 97 S.Ct. 2366, 2371, 53 L.Ed.2d 464 (1977) (citing 42 U.S.C. §§ 1396, 1396a(a)(10)). A further objective is to assure that state Medicaid plans are administered “in a manner consistent with simplicity of administration and the best interest of the recipients.” 42 U.S.C. § 1396a(a)(19); Hodgson, 614 F.2d at 607. The Secretary’s construction of the implementing regulation for the endangerment certification provision could be said to further these objectives. In 1977, in promulgating 42 C.F.R. § 441.203, the Secretary noted:
The purpose of the certification requirement is not to enable the Department to question physician judgment, but rather to ensure that physician judgment has in fact been exercised. This is the most efficient manner by which a State agency or a program or project — or the Department in conducting audits or other enforcement reviews — may ascertain that the statutory requirements for a claim for Federal financial participation in an abortion have been met.
43 Fed.Reg. 4574. Thus, we will defer to the Secretary’s interpretation of her regulation that the sufficient condition triggering eligibility for a Medicaid funded abortion is certification by any physician that a woman’s life would be endangered by carrying the fetus to term.
In contrast to the Secretary’s construction of the federal certification regulation, Pennsylvania’s certification requirements narrow the Secretary’s criteria. The pertinent part of § 3215(c) of the Pennsylvania Abortion Control Act provides that no state or federal funds will be expended for an abortion, except:
When abortion is necessary to avert the death of the mother on certification by a physician. When such physician mil perform the abortion or has a pecuniary or proprietary interest in the abortion there shall be a separate certification from a physician who has no such interest.
18 Pa.Cons.Stat.Ann. § 3215(c)(1) (emphasis added). Under the Commonwealth’s Medicaid scheme, even if the attending physician who is to provide the abortion certifies that the procedure is necessary because of life *185 endangerment, there must be yet another certification. In effect, the Commonwealth’s regulation renders the certification of an attending physician irrelevant. This reading is contrary to the Secretary’s regulation, which provides that federal funding is available under such circumstances.
Accordingly, because the Pennsylvania second-physician certification requirement for abortions necessary to save the life of the mother conflicts with a Medicaid implementing regulation as construed by the Secretary, this requirement is invalid.
CONCLUSION
We hold that the Secretary’s construction of the Hyde Amendment is reasonable and requires due deference. Under the Secretary’s interpretation, both § 3215(c) and § 3215© of the Pennsylvania Abortion Control Act are invalid insofar as they (1) fail to allow for a waiver of the rape and incest reporting requirements in accordance with the HCFA directives and (2) require certification by a second physician in cases where the life of the mother is endangered. Accordingly, we will affirm the order of the district court to the extent that it enjoins the Commonwealth from (1) requiring certification by a second physician, and (2) enforcing its rape and incest reporting requirements until it adopts, pursuant to state law, a waiver in accordance with the HCFA directive. In all other respects, these provisions remain enforceable. We will remand for the entry of an order tailored in accordance with this decision.

. The original Hyde Amendment, enacted in 1976, limited federal funding to abortions where "the life of the mother would be endangered if the fetus were carried to term.” Pub.L. No. 94-439, § 209, 90 Stat. 1418, 1434 (1976). The Hyde Amendment for the following fiscal year expanded the funding to include abortions for victims of rape and incest as well as "instances where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term when so determined by two physicians.” Pub.L. No. 95-205, § 101, 91 Stat. 1460 (1977). From that year through 1981, the Hyde Amendment provided for reimbursement for abortions when a pregnancy resulted from rape or incest. The rape and incest provision was eliminated from the Hyde Amendment from 1982 until the appropriations bill for fiscal year 1994.

. The 1995 Hyde Amendment is identical in language to the 1994 version. Pub.L. No. 103-333, § 509, 108 Stat. 2539, 2573 (1994).

. HCFA reaffirmed its position regarding the Hyde Amendment in another letter to state Medicaid Directors, which stated:
HCFA will not establish a timeframe within which cases of rape or incest must be reported to a law enforcement or other agency. State law or policy should dictate when and to whom a rape or a case of incest must be reported. However, as noted in my December 28 letter, the State-established reporting requirements may not serve as an additional coverage requirement to deny or impede payment for abortions where pregnancies result from rape or incent (sic).

The State must establish procedures which permit the reporting requirements to be waived, and the procedure reimbursed, if the treating physician certifies that, in his or her professional opinion, the patient was unable, for physical or psychological reasons, to comply with the reporting requirements.

Letter, from Sally K. Richardson, Director, Medicaid Bureau, to All State Medicaid Directors (Mar. 25, 1994) (emphasis added), App. at 116— 17.

. Section 3215(j) of the Pennsylvania Abortion Control Act provides:
No Commonwealth agency shall make any payment from Federal or State funds appropriated by the Commonwealth for the performance of any abortion pursuant to subsection (c)(2) or (3) unless the Commonwealth agency first:
(1)receives from the physician or facility seeking payment a statement signed by the physician performing the abortion stating that, prior to performing the abortion, he obtained a non-notarized, signed statement from the pregnant woman stating that she was a victim of rape or incest, as the case may be, and that she reported the crime, including the identity of the offender, if known, to a law enforcement agency having the requisite jurisdiction or, in the case of incest where a pregnant minor is the victim, to the county child protective service agency and stating the name of the law enforcement agency or child protective service agency to which the report was made and the date such report was made;
(2) receives from the physician or facility seeking payment, the signed statement of the pregnant woman which is described in paragraph (1). The statement shall bear the notice that any false statements made therein are punishable by law and shall state that the pregnant woman is aware that false reports to law enforcement authorities are punishable by law; and
(3) verifies with the law enforcement agency or child protective service agency named in the statement of the pregnant woman whether a report of rape or incest was filed with the agency in accordance with the statement.
The Commonwealth agency shall report any evidence of false statements, of false reports to law enforcement authorities or of fraud in the procurement or attempted procurement of any payment from Federal or State funds appropriated by the Commonwealth pursuant to this section to the district attorney of appropriate jurisdiction and, where appropriate, to the Attorney General.
18 Pa.Cons.Stat.Ann. § 3215(j).

. Section 3215(c) of the Pennsylvania Abortion Control Act provides, in pertinent part:
No Commonwealth funds and no Federal funds which are appropriated by the Commonwealth shall be expended by any State or local government agency for the performance of abortion, except:
(1) When abortion is necessary to avert the death of the mother on certification by a physician. When such physician will perform the abortion or has a pecuniary or proprietary interest in the abortion there shall be a separate certification from a physician who has no such interest.
(2) When abortion is performed in the case of pregnancy caused by rape which, prior to the performance of the abortion, has been reported, together with the identity of the offender, if known, to a law enforcement agency having the requisite jurisdiction and has been personally reported by the victim.
(3)When abortion is performed in the case of pregnancy caused by incest which, prior to the performance of the abortion, has been personally reported by the victim to a law enforcement agency having the requisite jurisdiction, or, in the case of a minor, to the county child protective service agency and the other party to the incestuous act has been named in such report.
18 Pa.Cons.Stat.Ann. § 3215(c).

. The providers also challenged the second-physician certification provision as violative of Title XIX and the Due Process Clause of the Fourteenth Amendment The district court did not address these additional claims.

. The legislative history of this provision establishes that Congress added it to ensure that states would not impose bureaucratic and complicated mechanisms for determining eligibility that would deter recipients from obtaining care.
This provision was included in order to provide some assurance that the States will not use unduly complicated methods of determining eligibility which have the effect of delaying in an unwarranted fashion the decision on eligibility for medical assistance or that the States will not administer the provisions for services in a way which adversely affects the availability or the quality of the care to be provided. The committee expects that under this provision, the States will be eliminating unrewarding and unproductive policies and methods of investigation and that they will develop such procedures as will assure that the most effective working relationships with medical facilities, practitioners, and suppliers of care and service in order to encourage their full cooperation and participation in the provision of services under the State plan.
S.Rep. No. 404, 89th Cong., 1st Sess. 76, reprinted in 1965 U.S.C.C.A.N. 1943, 2017.

. We are aware of the related action, Ridge v. Shalala, No. 94-7751, which is currently pending in this Court, in which the Commonwealth is challenging HHS's "waiver” requirement as vio-lative of the Administrative Procedures Act. The district court dismissed the action on jurisdictional grounds because the Secretary has not yet called for a hearing nor issued a decision about the conformity of Pennsylvania’s plan with the Hyde Amendment. Casey v. Shalala, No. 94-390 (M.D.Pa. Nov. 28, 1994).

. In Gardebring, the Supreme Court, while recognizing that the Secretary had not taken a position until that litigation, held that:
when it is the Secretary's regulation that we are construing, and when there is no claim in this Court that the regulation violates any constitutional or statutory mandate, we are properly hesitant to substitute an alternative reading for the Secretary's unless that alternative reading is compelled by the regulation’s plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.
485 U.S. at 430, 108 S.Ct. at 1314. Thus, we will defer to the Secretary's construction of her own regulation even if the interpretation is put forth in litigation.